# DECISIONS

OF THE

# Supreme Court of Florida,

## AT TERMS HELD IN 1864–'5.

DAVID L. YULEE, APPELLANT, VS. ANTONIA A. CANOVA, MAJOR AND CHIEF OF SUBSISTENCE AND COMMISSARY IN THE CONFEDERATE ARMY, APPELLEE.

1. The agreement and stipulation in writing, entered into between the parties in this case, construed to be a contract of *purchase* of sugar, forced under the act of Congress called "The Impressment Act," the question of compensation *alone* agreed to be referred to the Court of Chancery, and a stipulation therein that on the part of the purchaser, he was to have the right to go on under the form of proceedings laid down in the impressment act, which appraisement when made and the proceedings relative thereto, he was to have the privilege of putting in before said Court as *persuasive evidence* on his part, for the Court to consider in arriving at the amount of compensation to be allowed for said sugar.

2. A public agent contracting for the use of the Government in the line of his duty, and by legal authority, is not personally responsible. But, if he enter into a contract, agreement or stipulation, *not authorized by legal authority*, then it is presumed he intended it as a private contract, agreement or stipulation, and he is personally responsible.

3. Neither under the Impressment Act nor the General Orders of the Department, is the impressing officer, if he and the producer cannot agree on the price, authorized to change by agreement or otherwise the mode dan manner of fixing the compensation prescribed by said act.

4. An agreement, by an impressing officer, who has given notice of his intention to impress goods under said Impressment Act, that he will refer to a Court of Chancery the question of compensation, thereby changing

2

the mode and manner of fixing the compensation as prescribed by said act, is an agreement not authorized by legal authority, and under the law it will be presumed he acted in his private capacity.

5. The fact that the defendant in the bill of complaint is described as Major and Commissary, &c., and the allegations that he as such officer acted so and so, is, under the circumstances surrounding this case, but a mere *descriptio personæ*, and may be treated as inducement or surplusage.

6. It is a general rule that Courts of Equity will not entertain jurisdiction for a specific performance of agreements respecting goods, chattels, &c., and other things of a mere personal nature. Yet, this rule is a qualified one and subject to exceptions, and Courts will only weigh with greater nicety contracts of this description, than such as relate to lands.

7. Where the specific performance of a contract respecting chattels will be decreed upon the application of one party, Courts of Equity will maintain the like suit at the instance of the other party, although the relief sought by him is merely in the nature of a compensation in damages or value.

8. The common saying that the "consent of parties can never give or bestow jurisdiction upon a Court," applies to Courts of limited jurisdiction, that is to say, matters in which the Court is prohibited from taking jurisdiction either by the constitution or the laws.

9. In the case at bar, the Court of Chancery had jurisdiction of the agreement, irrespective of the consent of parties, and therefore had jurisdiction over the agreed case—that is to say, it was not the consent alone that gave the jurisdiction.

10. Under the agreement and stipulation in this case, the proceedings before the local appraisers and board of commissioners are but evidence, and are not to be considered as a decision of the issue in this case.

11. What constitutes *Res Adjudicata*, defined.

12. "Just compensation," whether used in the Impressment Act, or in a contract, means an equivalent—a recompense in value for the property taken—what the article would sell for in the market, quality and quantity considered, and not the price which the owner might demand or which some person for especial reason might be willing to give.

13. According to numerous decisions, the market price where the article was sold and delivered should be the governing rule; and in all contracts for the sale of goods, the price to be fixed therefor, where no price is agreed upon, is the value thereof (quality and quantity considered), on the day of the sale and delivery.

This case was decided at Tallahassee.

Yulee vs. Canova—Statement of Case.

Appeal from Suwannee Circuit Court.

In stating this case, it becomes necessary to give a detail of so much of the proceedings in the case of the City of Savannah hereinafter mentioned, the impressment, negotiation for purchase, appraisement, appeal to the board of commissioners, agreement, &c., as may be applicable to this case and necessary for a history thereof, because by agreements of the parties hereinafter set-forth, it was stipulated that they should " be placed in evidence before the Court," and were so considered in the Court below, and thus come up to this Court as part of the record.

It appears from the record that sometime in the early part of July, A. D. 1863, the appellant, (Yulee,) had sixty-four hogsheads of sugar weighing 49,898 pounds *in transitu* from his plantation to a market, being stored in the warehouse in Waldo, on the Florida Railroad, of which road the said Yulee was President, consigned to Savage, Brother & Co.— that said sugar was raised and produced by said appellant and constituted his crop. That sometime on or about the 14th day of July, 1863, one Edgar M. McDonell, Esq., negotiated with and purchased of said consignees of said Yulee forty-nine or fifty hogsheads thereof for the City of Savannah under and by virtue of the following authority:

"MAYOR'S OFFICE,
SAVANNAH, March 26th, 1863.

" This is to certify that the bearer, Edgar M. McDonell, Esq., has been appointed by the civil authorities of this city agent to proceed along the line of the Savannah, Albany & Gulf Railroad, and country adjacent thereto, for the purpose of purchasing provisions for the needy of this city. The authorities here reposing the utmost confidence in the patriotism and ability of Mr. McDonell, ask the aid and co-operation of all good and patriotic citizens through whose section

of country he may pass.   All railroads and State agents, it is hoped, will pass Mr. McDonell free of charge.

"P. HOLCOMB, Mayor.

"Attest—RICHARD W. COPE, Clerk of Council."

For which sugar, the said Yulee was to receive the sum of ———————— per pound.   That either on the 13th or 14th of July, 1863, the said Canova as Chief of Subsistence and Commissary gave notice to one Pace, keeper of said warehouse, that said sugar was needed for the use of the troops, and directing him not to let it pass out of the warehouse, the said Canova acting under the following authority:

"CONFEDERATE STATES OF AMERICA, SUBSISTENCE DEPARTMENT, RICHMOND, April 14, 1863.

"SIR: In compliance with paragraph 2, of article II, of General Orders No. 37, dated April 6th, 1863, a copy of which is herewith enclosed, the Commissary General hereby designates you as an officer of this Bureau to impress.   You will not extend this power to any one.

"Very respectfully,

"Your ob't servant,

"B. WILLIAMS, Major and C. S.

"Major A. A. Canova, C. S., Lake City, Florida."

HEAD QUARTERS, DIST. E. FLA., LAKE CITY, July 9th, 1863.

SPECIAL ORDER, No. —.

Major A. A. Canova, Brig. Com., will procure without delay, by purchase or otherwise, a supply of sugar for the troops in this District, sufficient to last until the incoming crop is gathered.

By order of Brig. General FINEGAN, comd'g.

W. CALL, Adj't.

That on the 14th July, 1863, the said A. A. Canova wrote the following letter to said Yulee, proposing to purchase said sugar:

"OFFICE CHIEF OF SUBSISTENCE, ⎰
GAINESVILLE, FLA., July 14th, 1863. ⎱

"D. L. YULEE, Esq., Gainesville, Fla.:

"SIR: I desire to purchase from you for the Confederate States Government a lot of sixty-four hhds. sugar, purporting to be yours, and now stored in depot warehouse at Waldo, Fla. I will give you forty-five cents per lb. for it when weighed, payable in Confederate Treasury Notes, or by ch'k on Bank of St. Johns at Lake City, Fla., as you may prefer.

"Be pleased to signify whether you will sell at the above stated price or not.

"Very respectfully, &c.,
"A. A. CANOVA,
"Major, &c., C. S."

That on the 25th July, 1863, the said Canova made another application to purchase said sugar, in the following letter:

"OFFICE CHIEF OF SUBS., ⎰
GAINESVILLE, FLA., July 25th, 1863. ⎱

"DAVID L. YULEE, Gainesville, Fla.:

"SIR: I desire to purchase from you on account of the Confederate States Government, as necessary subsistence for the armies of the Confederate States in the field, sixty-four (64) hhds. of sugar now stored in depot warehouse at Waldo, on the Florida Railroad, for which I will pay you forty-five (45) cents per pound in Confederate Treasury Notes, or by check on the Bank of St. Johns, at Lake City, as you may prefer.

"If you refuse the price offered above, I shall proceed to impress the said sugar, and compensation for the same will

be made according to the acts of Congress relating to impressments.

"Very respectfully, &c.,

"A. A. CANOVA,

"Major and C. S."

That on the same 25th July, 1863, the said Canova gives the following notice to the depot agent in charge of the warehouse in which said sugar is stored:

"OFFICE CHIEF OF SUBS.,
GAINESVILLE, FLA., July 25th, 1863.

"Mr. AUGUSTUS N. PACE, Agent of the Florida Railroad in charge of warehouse of said Company, at Waldo, Fla:

"SIR: I desire to purchase from David L. Yulee, Esq., on account of the Confederate States Goverment, as necessary subsistence for the armies of the said Confederate States in the field, sixty-four (64) hhds. sugar, the property of said D. L. Yulee, which sugar is now in the warehouse of the Florida Company, in your charge, for which sugar I offer forty-five (45) cents per pound payable in Confederate Treasury Notes, or by check on Bank of St. Johns, at Lake City, as may be preferred; upon the refusal of the price above offered, I shall proceed to impress the said sugar, and compensation for the same will be made according to the acts of Congress regulating impressments.

"And I hereby inform you that this notice according to law and the regulations of the War Department binds the said sugar until the completion of the negotiation for the sale or appropriation thereof. You will therefore not allow the said sugar to be removed from the warehouse in which it is now stored, except by my order.

"Very respectfully, &c.,

"A. A. CANOVA,

"Major and C. S."

That said letter, in the absence of said Yulee, was an-

Yulee vs. Canova—Statement of Case.

swered by Sam'l A. Swann, Att'y, disclaiming all ownership in the sugar, and alledging it to have been sold to the City of Savannah, with a reservation of five Hhds.

That thereupon the said Canova, on the 30th July, 1863, made application to purchase the same of the said agent of the City of Savannah, as appears by the following letter :

"OFFICE CHIEF OF SUBS.,
GAINESVILLE, FLA., July 30th, 1863.

" Mr. E. M. McDONELL, Gainesville, Fla. :

" SIR : I understand by a communication from D. L. Yulee, Esq., that you as the agent of the City of Savannah, Geo., have purchased the sixty-four Hhds. of sugar in the Railroad warehouse at Waldo, which sugar I have impressed as the property of said Yulee. It matters not to whom the sugar belongs ; it is necessary for the subsistence of the armies of the Confederate States in the field, and it is my duty to obtain it. Without admitting or denying the facts as stated by Mr. Yulee, if you are the owner of the said sugar, or if you represent the owner, I hereby offer to purchase the same, and will give forty-five cents per pound for it, which is the highest price for sugar as fixed by the Commissioners in the District of East Florida.

It is not the desire of the Confederate authorities in this Department to proceed arbitrarily or to use force in appropriating the property of individuals for public use, but to proceed as the law directs.

If, therefore, you wish to submit the law, or your rights under the law, to the consideration of the Court, I, on the part of the government will agree to make up a case and submit the issues between us to his Honor Judge Dawkins, and have our rights determined without delay.

" Very respectfully, &c.,

" A. A. CANOVA,

" Major and C. S."

That on the 6th day of August, 1863, the said McDonell, agent for the City of Savannah, made affidavit "that the hogsheads of sugar purchased by him for the City of Savanah, from Messrs. Savage & Bros., was so purchased not for sale or speculation, but for the City of Savannah, and is so purchased and held by the City of Savannah for the use and consumption of the citizens composing the corporation and their families and for no other use."

That the said Yulee, on the 9th of August, made affidavit as the owner and producer of the remaining five hhds.

That on the 24th of August, A. D. 1863, the City of Savannah, by its agent said McDonell, filed in the Court of Chancery, holden in and for the Suwannee Circuit, in said Gainesville, before his Honor James B. Dawkins, Chancellor, its bill of complaint against Antonia A. Canova, Commissary in the Government of the Confederate States with rank of Major, and now on duty in the State of Florida, and also against David L. Yulee and George Savage of the firm of Savage, Brothers & Co., alledging in substance, that the City of Savannah purchased said sugar, and entered into the following agreement in writing, to wit :

" Memorandum of an agreement entered into by Savage & Brothers agent for D. L. Yulee of the first part, and Jno. F. McDonell agent for E. M. McDonell, who is agent for the City of Savannah, of the second part, witnesseth, that Savage & Brothers agent for D. L. Yulee, of the first part, do agree to sell unto Jno. F. McDonell agent for E. M. McDonell, who is agent for the City of Savannah, of the second part, all of the sugar now in the warehouse at Waldo, belonging to D. L. Yulee, with the exception of five hhds., at the the following rates: the first quality to be at the price of one dollar and ten cents per pound, the second quality to be one dollar per pound, to be delivered at the warehouse at Waldo, as soon as the proper agent for the City Council of Savan-

nah, E. M. McDonell, arrives ; the sugar to be paid for before delivery.

"Witness our hands and seals this 14th day of July, 1863.
"SAVAGE, BROTHERS & CO., [Seal.]
"JNO. F. McDONELL, [Seal.]"

The bill further alleges, that as soon as the City of Savannah were advised of the said purchase, that they through F. L. Gue, Chairman of Special Committee of the City Council of Savannah, authorized the said E. M. McDonell to proceed to Florida and take charge of the sugar. That on the arrival of said E. M. McDonell, he called upon George Savage, of the firm of Savage, Brothers & Co., agents for D. L. Yulee, for the sugar purchased as aforesaid, who declined to deliver the same because it had been impressed or attempted to be impressed, by said Canova, as the property of D. L. Yulee. That the sugar being claimed as impressed, they could not deliver it to either party until the question of right was settled, but that if they were willing to deliver they were unable, being overpowered by military force, as troops were stationed over it.

The bill further avers that the duty of the Railroad Company was to deliver to the order of the consignor, as the Company was a common carrier, the sugar having been deposited in the warehouse of the Company for that purpose.

The bill further alleges that there was a pretended impressment of said sugar made on the 15th July, 1863, by Major A. A. Canova, which was not made in accordance with the impressment act and altogether informal and void, there having been no offer to negotiate or purchase, and there being no emergency in the field, or necessity existing for its seizure. It is further alleged in the bill that the said Canova, about the time of his having taken possession of said sugar, placed a military guard to hold the same; and it is further charged that the said Canova, by his letter of the

25th of July, 1863, addressed to said Yulee, as will appear
from the manifest effect thereof, placed no reliance upon his
former pretended impressment, and that it was only upon
the 25th July, aforesaid, he commenced operations under the
law for the purpose of seizing said sugar, as belonging to
said Yulee, a period one day later than the time when
E. M. McDonell was commissioned by the city of Savannah
to come to Florida and receive and take charge of the
same; Savannah being a large and populous city, and sixty
hogsheads sugar being but a very small quantity for its citi-
zens.

The bill further insists that even the full and complete
impressment of the sugar, as the property of D. L. Yulee,
can have no effect upon the title of the city of Savannah in
said sugar, when it is made to appear that it belonged to the
city of Savannah at least one day prior to the first pretended
impressment, and eleven days prior to the commencement
of negotiations and impressment on the 25th July, the more
especially that even up to the 30th July, no notice had been
served on the city of Savannah or either of its agents, but,
on the contrary, a proposal to purchase it of the city of Sa-
vannah on that day.

The bill further avers that neither on the 15th, 25th, nor
30th July, did the exigencies of any army in the field in
Florida, or any point accessible to said State, make impress-
ment of sugar necessary under the provisions of the first sec-
tion of the impressment act.

The bill further avers that up to the 14th July, 1863, there
was no impracticability in procuring sugar in East Florida,
and avers that so far as that being the case, one of the de-
fendants, (D. L. Yulee,) sometime previous thereto, tendered
to the government his entire sugar crop, but was informed
that the government did not need it and did not wish to
purchase, that the government had a supply that would last
the whole army for one or perhaps two years, and that he

also afterwards offered it to Major P. W. White, the present purchasing Commissary of this State.

The bill further charges that on or about the time of the pretended impressment of the sugar aforesaid, some sixteen thousand pounds was stored at Gainesville, all of which could have been purchased by said Canova, and all of which has since been received by him upon an understanding that the said Canova would pay the owners whatever the civil tribunals might allow in this case.

It is further averred that the said Canova could then have purchased other sugar and can still purchase sugar for the use of the Government, provided he will pay a just compensation for the same, viz: the market price.

The bill further avers that the Secretary of War is alone authorized, under the 4th section of the impressment act, to determine when and where it is necessary to take private property for public use, so as to accumulate supplies in certain localities, and even he can only authorize the impressment of supplies when they cannot be purchased for a just compensation; and it is averred that sugar could then have been purchased in Florida on those terms.

The bill further charges that purchases made in the spirit and for the objects designated as above, are exempted from impressment by virtue of the 7th section of said act, as well as by the 6th section of the said act, and that the city of Savannah were entitled to the delivery of said sugar on the 26th July, and that the same would have been delivered but for the interposition of the said Canova as above stated.

It is claimed in the bill that the city of Savannah are entitled to recover the market value on the day of adjudication, as well as all damages for its detention.

The bill further avers that the commissioners of appraisement, appointed under the 5th section of the impressment act, are not appointed to establish prices for produce held

for consumption, but if they were cannot set an arbitrary value on sugar, either sixty or one day in advance of the seizure ; that such valuation in advance is a plain and palpable violation of the Constitution of the Confederate States, as well as that of this State, which only admits the taking of private property for public use on the payment of a just compensation or equivalent for the same, and insists that the discrimination made by the commissioners on the price of sugar between East and West Florida is unjust in the extreme and ought of itself to render the appraisement so made by them null and void ; and it insisted that the 5th section of the impressment act provides that the commissioners in the appraisements made by them, even if the same were legal, shall affix such prices as will " afford just compensation to the owners thereof;" and it is insisted that the valuation placed on sugar was made sixty days in advance, and was not equal to one-half its market value on the day of seizure, or upon the days when a proposition of purchase was made. And the bill further insists that if it shall appear that the sugar was subject to impressment and was legally impressed, that the price the city of Savannah is entitled to receive is the market price ascertained by the court, or as is contended is provided in the act, if the parties should agree thereto.

The bill further avers that on the 15th, 25th and 30th July, 1863, and for a long period anterior, P. W. White, and not Antonia Canova, was chief of the purchasing department under the government for the State of Florida, and insists that A. A. Canova had no authority whatsoever from the war department or any other department to impress sugar, either upon an emergency or for collecting it to be stored in certain localities.

The bill further prays for an injunction enjoining the said Canova from retaining forcible custody and possession of the sugar aforesaid, and requiring him to deliver the same to the city of Savannah.

On the 26th of August, 1863, the said Canova puts in answer to the said bill of complaint of said city of Savannah, in which, so far as is relevant to this case, he in substance says: That said McDonell was not an agent of the city of Savannah; that said city is not authorized under its charter to engage in commerce and in the purchase of articles of subsistence or any other products, or to employ agents therefor, or to sue or be sued upon causes arising therefrom. It further insists and denies that the Florida Railroad has any interest or connexion with said suit, and that the said D. L. Yulee and George Savage have any proper connexion therewith.

And the said answer further denies that the city of Savannah, by its said agent, purchased said sugar as is alleged, and that if there was any contract between the said city of Savannah and said Yulee, for the purchase of said sugar, it was after the said parties had received notice, in some form, of the necessities of the army and of the intention to impress the sugar in question.

The answer further avers that the allegations of said bill, in reference to the time, &c., and the force stationed to guard said sugar, are immaterial and irrelevant, as also the failure of the Railroad Company to deliver said sugar.

The answer denies that there was no offer to purchase said sugar and nothing but an absolute military seizure made at a time when there was no necessity therefor, and avers that there was a necessity, and that offer to purchase was made in accordance with the law, and orders from the war department to the agent, owner or bailee of said sugar; and that the letter addressed on the 25th of July to said Yulee, was written in the abundance of caution after offer to purchase and notice of impressment had been served, and is immaterial and irrelevant.

The answer further insists that under the law of impressment it was perfectly immaterial whether the said sugar was

the property of the said city of Savannah or of the said Yulee.

The answer further denies that the exigencies of the army in the field, in the District of Florida, did not require the impressment of said sugar, but on the contrary avers " that the purchase or impressment of said sugar *was a pressing and immediate necessity* ;" that the allegations in reference to the practicability of procuring sugar in East Florida, previous to the 14th day of July, and as to the correspondence of the said Yulee with the Secretary of War and others, are immaterial, irrelevant and insufficient in law.

The said Canova further avers in his said answer, " that on or about the 14th day of July, it was impracticable to procure the supply of sugar necessary for the two districts except by impressment," and *"that he was then in possession of requisitions which he was wholly unable to supply."* But this defendant avers that the said sugar could only be obtained by prices authorized by government or by impressment, and defendant avers that the sugar stored in Gainesville, referred to in said bill, was seized by the government, as the sugar in question was, and that both are inadequate to supply the wants of the service till the incoming crop. And he further avers that it was taken in accordance with and upon no other understanding than that allowed by the impressment act, and the orders of the department. And this defendant is willing to ·pay whatever price shall be fixed by the civil tribunals and sanctioned by his superior ·authorities.

The answer further avers that " the impressment act authorizes the Secretary of War to inaugurate impressments as a system, and not in specific cases ; and the Secretary of War has by general orders inaugurated it as a means of supplying troops ; and in accordance with such general orders the defendant proceeded in this case. And the defendant denies that he is bound to pay any other price than that

Yulee vs. Canova—Statement of Case.

affixed by the commissioners appointed under the impressment act; and further, that under any circumstances he would not be bound to pay the price of sugar at the time of adjudication."

" And defendant avers that under the 5th section of the impressment act the commissioners are authorized to fix a schedule of prices sixty days in advance of any seizure; that such schedule of prices was fixed, beyond which defendant was not authorized to pass."

The said Canova in his said answer further avers that he knows nothing of the rank or duty of P. W. White referred to in said bill, but says that he, said Canova, is the Chief of Subsistence for the State of Florida, and as such it is his duty to furnish supplies for the Departments of East and Middle Florida; that on the 14th day of April, 1863, he was appointed and authorized by the Secretary of War, through the Commissary General, to make impressments of subsistence in this State when necessary; that in the beginning of July the supply of sugar for the army of East Florida was quite short, and requisitions had been made upon him by Capt. A. B. Noyes, Assistant Commissary of Subsistence, stationed at Tallahassee, for sugar to supply the troops in his Department, which requisitions this defendant was wholly unable to supply. This defendant had made several attempts to purchase sugar and was unable so to do, *holders refusing to take the prices which he was authorized to offer.* As to what compensation should be allowed, this defendant knows of no rule other than the one provided by the impressment law and the amendment thereto.

The defendant, Canova, further answering says that for the purpose of most scrupulously complying with all the requirements of the law, he served another and further notice on the said Pace.

In answer to the 12th interrogatory the said Canova says, " he had instructions from the chief of his bureau, approved

by the Secretary of War, to impress articles of subsistence for the use of the army, and under them was authorized to impress said sugar, and refers to General Orders, Nos. 92 and 37, Adjutant and Inspector General's Office, series 63, and Department Head Quarters, No. 127, series 62, and written instructions of Commissary General of 14th April, 1863, marked Exhibit G. H. I.

### *Extract from General Orders, No. 92.*

" Hereafter supplies will be obtained, as far as practicable, by purchase, and when necessary by impressment; and officers, when authorized to resort to impressment, will observe strictly the requirements of law and the General Orders of the War Department and the regulations of this office founded thereon."

### *Extract from General Orders, No. 37.*

" IV. Before any impressment of property shall take place, the impressing officer or his agent shall make an offer, addressed to the owner, his bailee or other agent, to purchase the property, describing the property he wishes to purchase, the price to be paid, and the mode of payment, whether in money or by certificate, and stating that upon the refusal of the price offered, that compensation for the property will be made according to the act of Congress aforesaid, for the regulation of impressments; which notice shall bind the said property until the completion of the negotiation for the sale or appropriation thereof, so that there can be no removal or transfer of the same.

" V. In the event of the refusal of the price offered, the impressing officer shall proceed to settle the compensation to be paid, according to the first section of the act aforesaid, if the property belongs to a person who has grown, raised, or produced the same, or who holds or has purchased the same for his own use or consumption; but the said property shall be paid for according to the fifth section of the act

Yulee vs. Canova—Statement of Case.

aforesaid, if the property is held for sale or other purposes than those before mentioned.

"VI. That the property shall remain in the possession of the owner, his bailee or agent, and at his risk, during the pendency of the proceedings for the ascertainment of the compensation, unless it shall be otherwise agreed to, or unless some urgent necessity shall require the possession of the property to be changed. In case of a change of possession, the Confederate States shall be regarded as the owner, and the property shall be held for their account and risk."

Remark by the Court. The other orders referred to above are not found in the record.

On the 26th of August, 1863, the said Yulee files his answer in which he says: That he was advised of the sale of said fifty-nine hogsheads of sugar by his agents, Savage, Brother & Company, to the city of Savannah, as stated in said bill of complaint; admits what is stated in said bill as to his willingness and desire to let the government have his sugar, and the various offers therein stated to agents for that purpose without success.

On the 26th of August, 1863, the said George Savage, of the firm of Savage, Brother & Company, files his answer and admits all the material allegations and facts as set forth in the bill of complaint, so far as they relate to the negotiations and transactions between the agents of the city of Savahnah and the house of Savage, Brother & Company.

On the same 26th of August, the Florida Railroad Company, by its President, filed its answer admitting all the material facts and allegations set forth in the said complainant's bill.

### Testimony.

*John F. McDonell,* called by complainant, says: That on the 14th July, he purchased sixty hogsheads of sugar for E. M. McDonell, agent of the city of Savannah, from Sav-

4

age, Brother & Company, agent of D. L. Yulee. Previous to that, E. M. McDonell was here making large purchases for city of Savannah; the articles purchased by him were marked to city of Savannah and shipped there. Sugar and syrup were purchased. Had been instructed by E. M. McDonell to purchase for him previously sugar and syrup, and made a deposit of money for that purpose.

Proves the articles of agreement.

*Cross examined.*—E. M. McDonell was purchasing articles in May and June; sixteen or seventeen thousand dollars expended for city of Savannah; entered into negotiations with Mr. Yulee in June for purchase of this sugar; saw his old commission as agent, don't know by whom it is signed, to purchase provisions generally; don't know the date of it; market value of sugar on 14th July, worth from $1 to 1.20; more in Savannah; nothing been paid for the sugar to Mr. Yulee; not to be paid for until delivered.

*R. W. B. Hodgson* says: That he has been offered sugar, five thousand pounds since 14th July; offered some sugar again, then sixteen hundred pounds; sugar was selling at $1 and 1.25; in stores, from 1.25 to 1.50; the five thousand pounds was offered at the market value; purchased none since 14th July. Witness has not tried to purchase sugar.

*Augustus Pace.* Was railroad agent at Waldo, 64 less 25 hhds. were stored there previous to 13th July, stored by Mr. Yulee; on the 13th day the 25 more making 64 hhds., were brought there, all Mr. Yulee's; acting as agent of the F. R. Road Co.; on 15th July, first notice served upon him of impressment of the sugar.

Cross examined—Mr. Canova handed him the notice; was present when Mr. Canova weighed sugar on 1st August.

*Dr. Harvard* says: Price of sugar now is $1.50, can't say what it was worth then; thinks about middle of July worth $1.00, might have been worth $1.50 then; has sold at $1.50 and bought at $1.00; about 1st of July purchased at $1.00.

Cross examined—Witness not a producer but purchaser; retail price is $1.50.

*S. Dupoise* says: Knows the price of sugar to be on the 10th July, 75 cents, about three weeks ago sugar sold for $1.05; Geo. Brown had 35 barrels sold at that price; sugar worth now $1.10 in Marion County, 23 miles from here; knows of no sugar for sale except in small quantities, none over 100 pounds to be sold; Gen. Owens sold sugar in April or May, 40 or 50 barrels, was paid 70 cents to be delivered at Archer.

Cross examined—Knows nothing of his own knowledge as to how much sugar Brown had.

*Dr. Harvard* recalled. Knows the City of Savannah; population of the City is about 25 or 30,000; does not know Mr. Gue.

*Major Bailey.* Resided in Savannah some years ago, the population then was 10 or 15,000, supposes the population was 15 or 20,000 previous to the war; has decreased he thinks since the war.

*John F. McDonell* recalled. Recollects that he came to Gainesville on 14th July to see Judge Dawkins, after he made the purchase; he mentioned to Major Barrett in pres- ence of Canova that he had purchased all Mr. Yulee's sugar; Canovo said he had seized it, and he had given too much; informed Mr. C. that Mr. Yulee in the contract said if the Government wanted for the troops in East Florida any of the sugar, he, Mr. McDonell, must let them have it upon the same terms. Conversation occurred in an hour or so after the sale on 14th July. Mr. Yulee also reserved five hhds. in the trade to purchase cotton cards for the poor of the different counties.

*Mr. Swann* says: Letter of July 25th, addressed to Mr. Yulee by Commissary was received by him in absence of Mr. Yulee; received information from Savage, Bro. & Co.; was present when Mr. J. F. McDonell was making negotia-

tions prior to sale; thinks it not consummated, &c., &c., but would wait until his brother returned; recollects no communication addressed to Mr. Yulee on 14th July; had power of att'y to act from Mr. Yulee in regard to sugar.

*Major Russell.* Knows sugar was purchased in June for 65 cts., July, 80, and latter part of July, 100; was asked for sugar $1.25 some 12 or 1,500 pounds some six or seven days ago.

*Mr. Meader.* Is Superintendent of F. R. Road; Mr. Pace is Station agent, his duties are to receive freight and ship it; acts entirely in subordination to Superintendent; was on train 13th July, stopped there at Waldo; Major Canova stopped there; Canova said nothing about the sugar, remarked it was well put up; Pace said nothing to Meader about sugar being seized until morning of 16th of July, and gave him no notification in the evening; it was the duty of Mr. Pace, as Station agent, to make the communication;— gave Mr. Yulee notice on evening of 16th July, don't know of any other notice he could have had previously; was present when Mr. Yulee and Jno. F. McDonell were talking of sugar.

*Capt. Call.* Is Ass't Adj't Gen'l of the District to give number of troops and locality; have several thousand forces within the State; several thousand in Eastern Division; did not issue an order for the seizure of this sugar.

There was an order issued upon the basis of reports of deficiency of sugar in this district, to procure sugar, addressed to Major Canova from Gen'l Finegan, to procure a sufficiency of sugar for the troops in this district, by purchase or otherwise, until the incoming crop.

Witness cannot give dates but is impressed it was subsequent to this transaction that Major White was appointed; Major White is now chief of subsistence.

Cross examined—This country is liable to raids at all times, has been one in last ten days; thirty or forty men were out

Yulee vs. Canova—Statement of Case.

near Jacksonville and captured five or six men. Troops under Gen'l Finegan's command are regarded as troops in the field and not in garrison. Major Canova has not been relieved from his duty as Commissary, and is held responsible by the commanding General for this discharge of his duty until relieved.

*A. Pace* recalled. There was a detachment of seven men to take possession of sugar at Waldo, on the 1st August; wished the officer in command to count the hhds., which he did and weighed them; had received no order to prevent weighing. On the 13th July, said he was going up to see Mr. Yulee and make him an offer, and if he did not take it, had orders to impress it.

*Major Barrett.* Jno. F. McDonell came into witness' room—Major Canova was present. McD. said to witness: I have just made a big purchase, this was on Tuesday, 14th July—had bought Mr. Yulee's sugar. Major Canova remarked he had seized. McD. said what he had paid, and for his brother for City of Savannah. Major C. asked witness if Mr. Yulee was in town, and if he could see him on matter of business. Mr. Y. said he was always accessible on business, and this was told Mr. C. Was here several days about that time. Hold office of Sec. & Treasurer of Fla. R. Road. Don't know of any application to Mr. Y. about the time.

*Mr. McOuen.* Is Station agent for Gainesville Depot. Paper offered was served upon him 15th July, 1863. Notice of impressment of sugar at Gainesville, handed to him by Major Canova. Endorsed upon it the time of service, 15th July. Made endorsement on the 16th July.

*J. F. McDonell.* The reason why he said there were only forty hogsheads, was that he did not know that the twenty-five hogsheads were removed from Waldo. The written contract was drawn up the 14th July, signed by McDonell & Savage the 15th; the reason why it was not signed on the

14th, was that he did not like some of the provisions of the contract drawn up on the 14th by Mr. Swann.

*Mr. Burnett.* About last of June attended an auction sale in Savannah, sugar sold for $1.00 and 15 cents. Price of transportation per pound would be 7 cents to Savannah—retail price in Savannah and Macon the middle of August was $2.00. Don't know the transportation of cotton and sugar to be the same.

*John Darley,* sworn for the defence, says: Had a conversation with E. M. McDonell in Lake City about the 27th of July—said he was on his way to Savannah about sugar his brother had bought for the City of Savannah. He said he regretted it very much, but Mr. Yulee would see it all right—said he would have made $4 or 5,000—said he was to see lawyers in Lake City. E. M. McDonell said he would lose nothing by it—meaning because Mr. Yulee would see it all right.

Cross examined—E. M. McDonell said something about commissions said City of Savannah paid him for purchasing; commission now about 5 per cent. Knows E. M. McDonell had been out here endeavoring to purchase for the City of Savannah; saw him have a paper purporting to be authority —no seal.

*Charles Canova.* Mr. McDonell came in the room of Major Barrett on Tuesday, 14th July, and stated that he had made an extensive purchase—Mr. Yulee's sugar; he had paid a pretty high price, $1.10 per pound—had purchased it for Edgar McDonell for use of City of Savannah. He asked Major Canova if he was seizing sugar, he told him he was; asked Mr. McD. where it was and what quantity— said about thirty hogsheads; asked him if that was all at Waldo Station that he had purchased—he said that he did not know. Major C. said there were 64 hogsheads at Waldo which he had seized the day previous and also a lot in the warehouse at Gainesville. Mr. McD. said if you have seized

it there was no sale and there was an understanding that if the Government wished any for E. Florida was to have it.

Cross examined ; was not certain whether he said there was 30 hogsheads or not, but thinks so—hears very well.

Remark by the Court. The testimony of Major White is not inserted because it is not deemed important, the authority of Major Canova to impress or purchase not being disputed.

Said cause was set down for hearing by agreement of counsel on the 25th August, 1863, and on the 11th of September, 1863, before the cause was submitted to the Court for final decree, the counsel for the city of Savannah presented to the Court the following disclaimer and moved to dismiss the cause, viz :

" MAYOR'S OFFICE,<br>
SAVANNAH, 5th Sept., 1863.

" This is to certify that the Corporation of Savannah has no interest whatever, directly or indirectly, in a lot of sixty or sixty four hhds. of sugar said to have been bought by Edgar M. McDonell from his brother, J. F. McDonell, and further that the City Authorities have not authorized any one to institute a suit at law against Major Canova or any other Confederate officer in the State of Florida, touching in any manner whatver any interest or interests which may be involved in said suit.

[SEAL.]                         " T. HOLCOMBE, Mayor.

" Attest—RICHARD W. COPE, Clerk of Council."

Which said motion was sustained and that cause ordered to be *dismissed.*

Whereupon the following *agreement* was entered into between the Solicitors of said Major Canova, Commissary, &c., and of said D. L. Yulee, viz :

" In Equity—Suwannee Circuit Court.

" David L. Yulee, ⎫
      vs.        ⎪
Antonia A. Canova,   ⎬ Exhibit " A."
Major & Chief of Subsistence, ⎪
      C. S. A.      ⎭

" It is agreed that this cause shall be entered on the docket and set for hearing in this Court before his Honor Judge Dawkins, upon the record, pleadings and proofs in the case of the City of Savannah, vs. A. A. Canova, with the distinct agreement that the question of compensation alone shall be put in issue and referred to the Judge for decision : And further, that the sugar shall be forthwith transported on the requisition this evening made upon the said Yulee, President of the Florida Railroad Company, by Capt. Call, and no further obstacles to its transportation interposed. This agreement includes the sixty-four hogsheads of sugar now in the warehouse at Waldo, owned by D. L. Yulee. This agreement is entered into because by judgment of the Court in the aforesaid case it resulted that the contract of sale between the said D. L. Yulee and Edgar M. McDonell was rescinded; and further, when the local appraisement provided for in the appraisement act shall have been made, subject to the right of appeal to the Board of Commissioners provided for in said act, the said appraisement and the proceedings relative thereto may be placed in evidence before the Court.

                      " L. J. FLEMING,
                          for A. A. Canova, Major.
                      " BANKS & McLEOD,
                          for D. L. Yulee."

September 11th, 1863.

    *Local Appraisement.*—17th September, 1863.

" We, the undersigned, chosen by David L. Yulee, Esq., of the one part, and by Major A. A. Canova, C. S. A., of the other part, being duly sworn, do, this seventeenth day of

September, 1863, appraise the above impressed property at the following rates, to wit: One hundred and eight 63-100 cents per pound, making in the aggregate the sum of fifty-four thousand two hundred and four dollars and nineteen cents.

" Witness our hands and seals.

" S. DOZIER, [L. S.]

" JAS. B. BAILEY, [L. S.]"

" The above appraisement is hereby disapproved of for the reason that the price allowed by appraisers is materially in excess of the schedule price fixed by the Commissioners. This matter is therefore respectfully referred to the Board for its decision and final valuation.

" A. A. CANOVA, Com.

(Board of Commissioners' Appraisement.)

" TALLAHASSEE, Oct. 20th, 1863.

" The undersigned, Commissioners under the impressment law, having revised the foregoing appraisement, do make final valuation under the amended act for the sugar impressed, and do value and award as just compensation for the same, seventy-five cents per pound.

" JNO. FINLAYSON, ⎫ Commissioners
" M. D. PAPY, ⎭ for Florida.

Extract of a letter, dated Sept. 23d, 1863, from D. L. Yulee to Banks & McLeod:

" I am perfectly willing to its immediate delivery, (the sugar) if there is no change in the original understanding, viz: That I shall deliver at once the sugar and that the Court shall determine the just compensation to which I am entitled; any other steps such as valuation, &c., by appraisers being only adopted as preliminaries to make sure, as counsel thought the jurisdiction of the Court. This understanding on my part, you will recollect, I repeated to Mr.

Fleming and your Mr. Banks, in his room on the morning you were leaving, and received the assent of both, that it was the correct understanding of the agreement. The tribunal of the Commissioners we of course do not assent to as in any way to bind us by its judgment. Under the agreement the Court is to ascertain the just compensation."

Afterwards, and on the 23d October, 1863, the said parties entered into a *supplemental agreement,* as follows:

"Exhibit B." It is agreed that the Confederate States have appropriated to its use, 64 hhds. sugar belonging to the complainant, of the gross weight of 56,702 pounds, and that the Court shall assess the compensation the said complainant is to have in accordance with the rules of law applicable to cases of similar nature. It is further agreed that for the purposes of the suit the sugar shall be considered in the possession of the complainant up to the time of trial.

Signed,                SMITH, BANKS & McLEOD,
                       L. J. FLEMING.

October 23d, 1863.

Afterwards, to wit: On the 11th day of May, A. D. 1864, the present suit was instituted by the complainant, Yulee filing his bill of complaint in Chancery against said A. A. Canova, Commissary, &c., before his Honor Judge Dawkins, in the Suwannee Circuit Court, in which bill of complaint it is alledged in substance, that during last season the complainant raised and manufactured on his plantation sixty-four hhds. of sugar of prime quality, the gross weight of which amounted to fifty-six thousand seven hundred and two pounds. That whilst said sugar was in the warehouse of the Florida Railroad Company at Waldo, and in *transitu* to market, it was seized and impressed by said defendant for the Government, under the operation of an act passed by Congress, commonly known as the impressment act, first as the property of the City of Savannah, and secondly as the property of David L. Yulee the producer.

The bill further alleges that on the 11th September, 1863, (at which time it was conceded by the defendant and admitted by the complainant that said sugar *then* belonged to the complainant Yulee,) it was agreed as aforesaid (see exhibits A and B above,) by the Solicitors for complainant and defendant that this cause should be entered, and that said Court either at Chambers or by intervention of a jury, should ascertain and decree what was "just compensation" for the sugar aforesaid.

The bill further avers that as early as the 14th July, 1863, he was offered $1.10 per lb. for the sugar, that the defendant on the part of the Government offered to purchase at 45 cents per lb., which he declined to receive.

The bill further alleges that on the 15th Sept., 1863, a demand was made upon him as President of the Florida Railroad Company by order of Brig. Gen'l Joseph Finegan, requiring him to furnish transportation and to remove all obstacles to the transportation of said sugar.

The bill further avers that on the 11th September, 1863, he, the complainant, was advised by his Solicitors that by virtue of the Constitution of the Confederate States, the officers of that Government had a right to take private property for public use on making just compensation therefor, and that this honorable Court could not take jurisdiction of this cause until the legal operations of the impressment law were exhausted, because under them it might be that just compensation for said sugar would be made, and that until the experiment was tried, it could not be alleged in the bill that your orator was remediless except in a Court of Chancery.

The bill further alleges that being anxious to expend all his legal remedies and rights of redress at law, before invoking the aid of Chancery, local appraisers under the impressment act met at Waldo Station and examined said sugar and awarded one dollar and eight cents per pound. That on an

appeal taken by the said Canova from the award of the local appraisers to M. D. Papy and John Finlayson, Confederate and State Commissioners appointed under said impressment act, said Commissioners set aside the award of the local appraisers, and only allowed seventy-five cents per pound, a sum averred to be grossly inadequate to the value of said sugar, and far from being just compensation for the same.

The bill further alleges that the allowance by said Board of Commissioners was based upon a schedule of prices fixed by the same two months prior to making their award; and he avers that said Commissioners never had seen the sugar on which they had set a price.

The bill further avers that on the 11th day of September, 1863, the said Canova represented to your orator that the soldiers in the field and in the hospitals were suffering for sugar, that there was little or none in Middle Florida and that the Government must have the sugar to sustain and support her soldiers; that an agreement was entered into by which the said Canova could have the sugar, and yet this complainant should not be deprived of any of his legal or equitable rights, and that for the purposes of this suit the sugar was considered in the possession of said Yulee up to the time of the adjudication of this cause.

The prayer of the bill is that a decree may be made awarding full and just compensation to said complainant for his sugar, and that he be protected from the unjust operation of the impressment law, and for such other and further relief in the premises as the nature and circumstances of the case may require and may seem meet and fit.

The answer of said Canova, to the said bill of complaint, sets forth that in the early part of July of last year the supply of sugar for the troops in Florida was nearly exhausted, and it became this defendant's duty to procure a supply for the immediate and further use of the army in Florida. That he was unable to procure sugar by purchase, holders refusing

to take the prices he was authorized to offer. That he was forced to resort to impressment as the means of obtaining the much needed article; and being duly designated and authorized to make impressments, &c., on the 25th July, 1863, formally and according to the provisions of the impressment act, impressed sixty-four hogsheads of sugar, at that time stored in the warehouse of the Florida Railroad at Waldo. That on the 1st day of August, 1863, from the opposition manifested by the parties interested in the said sugar to its impressment, fearing they might attempt to remove the same, took possession of the said sugar and caused a guard to be stationed at the warehouse at Waldo, to protect the removal of the same.

Answer further says, that after the bill of the City of Savannah had been dismissed, the sugar was claimed by D. L. Yulee, and it was proposed by the present complainant's counsel and assented to by defendant's, that the proceedings which had just been dismissed should be reinstated and the cause decided by the court on its merits on the pleadings and evidence in the case of the City of Savannah, D. L. Yulee being made complainant, but this proposition was *not entertained by the Court.* As it would take some time to bring the case before the Court again on new pleadings, *and as the Government was in immediate want of the sugar,* it was agreed by and between the parties complainant and defendant that the Government take the sugar, and the question of compensation should be referred to his Honor, the Judge of this Court, for decision, and that the proceedings under the impressment act, which had been suspended by the bill of the City of Savannah, should be completed, and that when the local appraisement provided for by the impressment should have been made, subject to the right of appeal to the Board of Commissioners provided for in said act, the appraisement and the proceedings relative thereto might be placed in *evidence* before the Court.

The answer says the net weight of said sugar was 49,898 lbs., and that for the purposes of this suit it was agreed the complainant should be considered in the possession of the sugar. The answer further says that the local appraisement was made as provided for by the impressment law, and the appraisers awarded a compensation materially in excess of the price of sugar established by the schedule of prices— that under the special instructions issued from the office of the Quartermaster General, it became the duty of this defendant to disapprove of the same and to refer the matter to the Board of Commissioners for revision and final valuation, who acted upon the same as stated in said bill; and the said defendant in his said answer further says and avers that he has been always and still is ready to pay complainant for said sugar according to the final valuation of the said Commissioners.

The defendant further says in his said answer that he did not intend to admit nor is it understood that he has admitted by any of the agreements entered into by him with the complainant, that the compensation tendered him, the said complainant, under the impressment law is not just or that the said complainant is entitled to any other mode of ascertaining the value of the said sugar; that these are questions for the Court to determine. On the contrary, this defendant contends that the compensation tendered is the one ascertained under the impressment law, an act eminently just in its provisions and protecting the interest of both Government and people, and the Court cannot interfere with its operations in pursuing its provisions; and the answer insists that if the Court should decide otherwise, and hold that the compensation tendered is unjust and inadequate, and that it is within its jurisdiction to give relief, the complainant is entitled to another and different mode of valuation, then this defendant insists that because the valuation may be made, it

TERMS HELD IN 1864-'5.        39

Yulee vs. Canova—Statement of Case.

should be determined by the value of the sugar at the time where and in its locality when the impressment was made.

## Testimony.

In addition to the testimony and proceedings, appraisements, &c., in the above City of Savannah suit, which by said agreement are made " *evidence*" in this suit, the following appears in the record :

*Houston* sworn. As agent of Mrs. Hopkins did sell sugar to Col. Summers, about six weeks since, at $2.05 per pound in new currency, delivered at Archer.

Offered and read in evidence the following letters :

"SAVANNAH, 26th April, 1864.

"MESSRS. SMITH & IVES :

"GENTS. : We have bought sugar here lately within a week at $4.50 to $5, and about two months ago at $3.50, which is the range of the market, and are now retailing at $6 per pound.

"Very truly yours,
"CLAGHORN & CUNNINGHAM."

"SAVANNAH, 27th April, 1864.

"MESSRS. BANKS & McLEOD, Lake City :

"GENTS. : Yours of 20th to hand, and the letter is badly torn so that we cannot make it all out. The market here for sugar is 4 to 4.50 per pound. Syrup $15 to 17 per gallon ; for the last two months sugar and syrup have been going up. Sugar 2.75 to the present price, and syrup 9.50-100 to the present.

"Yours truly,
"ERWIN & HARDEE,
"By JNO. J. DANIELS."

*Mr. Dozier* sworn. The sugar, sixty-four hogsheads of D. L. Yulee, first quality, was very good—second quality not so good ; inferior sugar much smaller quantity—was local appaiser—appraisement was made as of the day of impress-

ment—not of the value at time of appraisement. Impressed July 25th, 1863, award 17th Sept., 1863—have a letter showing sugar $1.75 in Savannah 17th Sept., 1863.

*S. W. Burnett.* Knows sugar is selling at $3.25. Sugar worth in April in Savannah—gave $1.75 for sugar a week ago in Florida.

*Mr. Allen.* Agent for Commissary Department, instructed to give $2 at plantation in new currency.

The cause being submitted, his Honor Judge Dawkins, made the following decree :

"The Confederate States, through its Commissary and agent, A. A. Canova, impressed and seized a lot of sugar belonging to the complainant, D. L. Yulee, and appropriated the same to its own use. Counsel for the respective parties entered into written agreements by which they agreed that the amount to be paid for the same should be referred to the Court, and the bill in this case was filed to recover its value.

"The appraisement by the local appraisers was made on the 25th July, A. D. 1863, and the cause was submitted to the Court on the 10th May, 1864, for adjudication. Considerable proofs were offered in reference to the increased price of sugar between the dates stated, showing that it had greatly enhanced in value.

"I was of opinion that just compensation should be ascertained by the appraisement of the property impressed at the *time and place of the impressment.* One of the appraisers (Dozier,) says that the appraisement made by the appraisers was so made.

"The proof before me is that there was 49,898 pounds of sugar, and that $1.08 63-100 per pound is a fair and just compensation for the same, according to the rule above laid down.

"It is therefore ordered, adjudged and decreed that the complainant, D. L. Yulee, recover of and from the defendant, A. A. Canova, Commissary, &c., the sum of fifty-four

thousand two hundred and four dollars and nineteen cents, and interest thereon from the 25th July, A. D. 1863."

From this decree an appeal is taken to this Court.

The following exceptions are filed thereto, viz :

"1st. The complainant excepts to the ruling of his Honor below because he bases his decree upon the impressment act and appraisement, instead of on agreements A and B.

"2d. Because his Honor erred in awarding compensation as of the day of impressment instead of the day of trial."

*Banks & McLeod, Smith & Ives,* and *Baltzell* for Appellant.

*John Howard* for Appellee.

FORWARD, J., delivering the opinion of the Court.

The bill now under the consideration of this Court, was filed in the Court below by the appellant against the appellee to compel a specific performance of the above contract and stipulation in writing, set forth in the bill *haec verba,* as Exhibits A and B, for the sale or purchase of sugar, forced under the impressment act of Congress ; and as by the pleadings the said parties differ materially as to what the contract and stipulation really was, it involves also the construction of the same.

On the part of the appellant it is contended that on the dismissal of the bill and proceedings instituted by the city of Savannah against the appellee, set forth in the above statement of the case and forming evidence in *this* case, the impressment, strictly speaking, fell with that case, and that therefore the sugar went into the hands of the appellee as Commissary, &c., not by impressment, although impressment was threatened, and the anticipation thereof forced it, but by *purchase.* That the present case is an agreed case, the

6

only one under the contract that could be instituted, and involves, as it was agreed it should, the price or compensation to be paid for said sugar.

On the part of the appellee it is insisted,

1st. That the Court below had no jurisdiction to ascertain and decree the compensation to be paid by the Confederate States for the property impressed; because in the acts of Congress authorizing private property to be taken for public use, a constitutional and legal remedy is provided for the ascertainment and recovery of the compensation to be made; and as well upon general principles as from the positive words of the acts, that remedy is *exclusive*.

2d. That the Court had no jurisdiction as aforesaid, because in *point of fact*, the whole question as to compensation was *res adjudicata*.

3d. The Court had no jurisdiction as aforesaid, because if the party could at all bring a suit against the appellee, as Major and Commissary of the Confederate States army, to recover the value of property taken and used by the Confederate States army, for the public good, his remedy is at common law and not in Chancery.

4th. That the Court had no jurisdiction as aforesaid, because, in point of fact, this is a suit against the Confederate States, through one of its military officers, for the recovery of money due and owing by the Confederate States for private property taken and appropriated to public use.

5th. That the Court had no jurisdiction as aforesaid, because neither Major Canova nor his counsel had any authority to submit the ascertainment and recovery of compensation against the Confederate States, to any other tribunal than that provided by Congress.

The first duty devolving upon the Court is the construction of the alleged contract or agreement and stipulation between the parties, and which is presented in the said Exhibits A and B, the two together, with the aid of the said

Yulee vs. Canova—Opinion of Court.

extract from the letter of Mr. Yulee, which it seems was read in evidence without objection, composing the contract of purchase, &c.

In examining this question it is proper that the Court should consider the real case and its actual circumstances, as all of them making up the history of the case are in evidence and form part of the record. It seems that at the time of the dismissal of the suit of the city of Savannah, and on the day of the entering into said agreement, in the first part thereof, to-wit: on the 11th of September, 1863, the said appellee, as Brigade Commissary, was ordered by Gen. Finegan, commanding the District of East Florida, to "procure without delay, by purchase or otherwise, a supply of sugar for the troops in this District, sufficient to last until the incoming crop is gathered;" that Capt. Call, the Adjutant, &c., had made a requisition upon the said appellant as President of the Florida Railroad, for the transportation of said sugar, and that "*the Government was in immediate want of the sugar;*" that from the experience of the proceedings in the suit brought by the city of Savannah, there were many "obstacles" which the said appellant as producer and owner might interpose, thereby causing delay (at least) in the enjoyment of the use of said sugar by the said government; among them, 1st. The ascertainment under the 7th section of the impressment act, by appraisers the amount necessary for the support of the owner and family, and to carry on his ordinary agricultural business. 2d. An adjudication as to whether Congress had established by law an impartial tribunal for ascertaining the fair and just value of the property taken. 3d. The inquiry whether there was an exigency of the army in the field making impressment absolutely necessary. 4th. Whether it was impracticable to accumulate sugar by purchase; and as it would take some time to bring the case before the Court again on new pleadings, therefore, to remove all these obstacles and any other

that might come in the way, it was, in the language of the answer of said appellee to this bill of complaint, " agreed by and between the parties, complainant and defendant, that the government take the sugar and the question of compensation should be referred to his Honor, the Judge of this Court, for decision; and that the proceedings under the impressment act, which had been suspended by the bill of the city of Savannah, should be completed; and that when the local appraisement, provided for by the impressment act, should have been made, subject to the right of appeal to the Board of Commissioners, provided for in said act, the appraisement and the proceedings relative thereto might be placed in evidence before the Court."

It is true the said appellee in said answer also denies " that he has admitted by any of the agreements entered into by him with the complainant, that the compensation tendered him, the said complainant, under the impressment law, is not just, or that the said complainant is entitled to any other mode of ascertaining the value of the said sugar." Yet this is perfectly consistent with the agreement of purchase, and that an agreed case should be made up, and the question of compensation " *alone*" shall be put in issue and referred to the Judge for decision; and that on that issue the proceedings, as if the sugar was impressed, were to go on, and then placed in *evidence* before the Court. But let us turn to the agreement. It sets forth the reasons why it is entered into, viz: " This agreement is entered into because by judgment of the Court in the aforesaid case, it resulted that the contract of sale between D. L. Yulee and Edgar M. McDonell was rescinded; and further, when the local appraisement, provided for in the appraisement act, shall have been made subject to the right of appeal to the Board of Commissioners provided for in said act, the said appraisement and the proceedings relative thereto may be placed in evidence before the Court." If the appellee had insisted upon his impress-

ment, and that the proceedings under the said act before the appraisers and Board of Commissioners, were the exclusive mode of proceeding to ascertain the fair and just compensation, why enter into the agreement to refer that matter "*alone*" to the Court, and stipulate that the proceedings should go on and be placed in *evidence* before the Court? or why stipulate at all? It seems to us he would have met the proposition to refer the compensation to the Court by the stern and decided reply, the act of Congress has provided the course and the only course for ascertaining that fact, if he had intended insisting upon that position before the Court.

In view of the history of this case, which is made evidence, and in view of all the facts, proceedings, and of the agreement entered into between the parties, the conclusion is irresistible to our minds, that the proper construction of the agreement is what it says, and in effect that the transaction was a purchase of the sugar, and the agreement was to refer the question of compensation *alone* to the Court, and that on the part of the appellee he was to have the right to go on under the form of proceedings laid down in the impressment act, which appraisement, when made and the proceedings relative thereto, he was to have the privilege of putting in *evidence*, that is to say as persuasive evidence on his part, to go before the Court as testimony, for the Court to consider in arriving at the amount of compensation to be allowed for said sugar. We are strengthened in this view by reference to the letter above, addressed to E. M. McDonell, by said appellee, dated 30th July, 1864, in which he says: "I, on the part of the government, will agree to make up a case and submit the issues between us to his Honor Judge Dawkins, and have our rights determined without delay."

This was the proposition made to Mr. McDonell. Afterwards it appears the obstacles to immediate use by the government thickened; the wants of the government were press-

ing; the ownership of the sugar was settled, and accordingly it became the interests of the government to remove all the obstacles. To this end, it does seem to the Court the said appellee entered into said agreement. Whether he acted by legal authority, or whether he incurred a personal responsibility, are different questions. By entering into this agreement, and in consideration thereof, he disarmed the producer and owner, the said appellant, from every other proceeding against him, either at law or equity, excepting the one pointed out in said agreement.

The contract is and was binding upon the appellant beyond all question, and he could only be relieved from it by application to the Court of Chancery to have it rescinded, or by subsequent agreement or acts of the other party. Should the appellant bring his action of trespass, trover or detinue against the appellee, he would be pointed to the agreement, and told you contracted not to do it. Should he bring his action of assumpsit for goods sold and delivered, the agreement would say in response, no delivery—by agreement you are in possession. Thus it would seem the appellant, by the force and operation of said contract, is entirely remediless in a court of law, and if he has no remedy in a Court of Chancery, then superior tactics have reversed the " obstacles.'"

Having thus construed the contract, the next question is, whether the Court below had the jurisdiction to enforce it? and this will, we apprehend, depend upon, 1st. Whether the appellee incurred a personal responsibility in said purchase by entering into the contract? 2d. Whether the bill and pleadings are sufficient for that purpose? 3d. Whether the Court had power to hold the parties to said agreement and stipulation?

The well settled rule of law is, that a public agent contracting for the use of government, in the line of his duty and by legal authority, is not personally responsible though

the contract is under his seal.—Hodson vs. Dexter, 1 Cranch,
343; Jones vs. Le Tombe, 3 Dallas, 385; Parks vs. Ross,
11 Howard, 374.

But if the credit be given to him, or was given, not as an
official engagement, or not in the line of his duty and by
legal authority, then he is personally responsible, or if he
enter into a contract, not authorized by legal authority, then
he is personally responsible.—Swift vs. Hopkins, 13 John-
son, 313. In this case the Court say, "Unless the contractor
shows distinctly that, in making the contract he expressly
or ostensibly acted as a public agent, it must be deemed a
private contract. The return does not show that Swift as-
sumed to act in an official capacity when he made this con-
tract; and the reason assigned by him for refusing to pay
was, that he could not make a charge of it against the gov-
ernment, is decisive to show that it was a private contract."
See also Lee vs. Monroe, et. al., 7 Cranch, 366.

Having thus laid down the law governing this branch of
the case, let us see whether this contract for purchase was
entered into and authorized by legal authority, and there-
fore made officially. Let us examine the impressment act
and see whether it was a subject fairly within the scope of
his authority.

The first act regulating impressments was passed the 26th
March, 1863, and it enacts in the first section thereof, "That
whenever the exigencies of any army in the field are such as
to make impressments of forage, articles of subsistence or
other property absolutely necessary, then such impressments
may be made by the officer or officers whose duty it is to
furnish such forage, articles of subsistence or other property
for such army. In cases where the owner of such property
and the impressing officer cannot agree upon the value there-
of, it shall be the duty of such impressing officer, upon an
affidavit in writing of the owner of such property, or his
agent, that such property was grown, raised or produced by

said owner, or is held or has been purchased by him, not for sale or speculation, but for his own use or consumption, to cause the same to be ascertained and determined by the judgment of two loyal and disinterested citizens of the city, county or parish in which such impressments may be made; one to be selected by the owner, one by the impressing officer, and in the event of their disagreement, these two shall choose an umpire of like qualifications, whose decision shall be final. The persons thus selected, after taking an oath to appraise the property impressed, fairly and impartially, (which oath, as well as the affidavit provided for in this section, the impressing officer is hereby authorized to administer and certify,) shall proceed to assess just compensation for the property so impressed, whether the absolute ownership, or the temporary use thereof, only is required."

The second section provides in substance, that at the time of taking the property, the impressing officer must pay to the owner the compensation fixed by the appraisers, and shall also give to him a receipt or certificate specifying the regiment, battalion, brigade, division or corps to which he belongs, that it is essential for the use of the army, and could not be otherwise procured, setting forth time, place, &c. This certificate is a good showing to the owner for the value specified in it, and, if the impressing officer fails to pay him for it at the time he takes it, it is the duty of the proper disbursing officer to pay it.

The third section makes provision for those cases where it is impracticable to have appraisement made at the time of impressment.

Section fourth enacts, " That whenever the Secretary of War shall be of opinion that it is necessary to take private property for public use, by reason of the impracticability of procuring the same by purchase, so as to accumulate necessary supplies for the army, or the good of the service, in any locality, he may, by general order through the proper subor-

dinate officers, authorize such property to be taken for the public use; the compensation due to the owner for the same to be determined, and the value fixed as provided for in the first and second sections of this act."

Section fifth enacts, "That it shall be the duty of the President, as early as practicable after the passage of this act, to appoint a commissioner in each State where property shall be taken for the public use, and request the Governor of such of the States in which the President shall appoint said commissioners, to appoint another commissioner, to act in conjunction with the commissioner appointed by the President, who shall receive the compensation of eight dollars per day, and ten cents per mile as mileage, to be paid by the Confederate Government. Said commissioners shall constitute a board whose duty it shall be to fix upon the prices to be paid by the government for all property impressed or taken for the public use as aforesaid, so as to afford just compensation to the owners thereof. Said commissioners shall agree upon and publish a schedule of prices every two months, or oftener if they shall deem it proper; and in the event they shall not be able to agree in any matter confided to them in this act, they shall have power to appoint an umpire to decide the matter in dispute, whose decision shall be the decision of the board; and said umpire shall receive the same rate of compensation, for the time he shall serve, allowed to said commissioners respectively: *Provided*, That said commissioners shall be residents of the State for which they shall be appointed; and if the Governor of any State shall refuse or neglect to appoint said commissioner within ten days after a request to do so by the President, then the President shall appoint both commissioners, by and with the advice and consent of the Senate."

Section sixth enacts, "That all property impressed or taken for the public use, as aforesaid, on the lands of any person

7

*other than* the persons who have raised, grown or produced the same, or persons holding the same for their own use or consumption, and who shall make the affidavit as hereinbefore required, shall be paid for according to the schedule of prices fixed by the commissioners as aforesaid. But if the officer impressing or taking for the public use such property and the owner shall differ as to the quality of the article or property impressed or taken, as aforesaid, thereby making it fall within a higher or lower price named in the schedule, then the owner or agent, and the officer impressing or taking as aforesaid, may select each a loyal and disinterested citizen, of the qualifications as aforesaid, to determine the quality of said article or property, who shall, in case of disagreement, appoint an umpire of like qualifications, and his decision, if approved by the officer impressing, shall be final; but if not approved, the impressing officer shall send the award to the commissioners of the State where the property is impressed, with his reasons for disapproving the same, and said commissioners may hear such proofs as the parties may respectively adduce, and their decision shall be final: *Provided*, That the owner may receive the price offered by the impressing officer, without prejudice to his claim to receive the higher compensation."

The seventh section enacts, "That the property necessary for the support of the owner and his family, and to carry on his ordinary agricultural and mechanical business, to be ascertained by the appraisers to be appointed as provided in the first section of this act, under oath, shall not be taken or impressed for the public use; and when the impressing officer and the owner cannot agree as to the quantity of property necessary, as aforesaid, then the decision of the said appraisers shall be binding on the officer and all other persons."

On the 27th April, 1863, Congress amended the above act by enacting, "That in all cases of appraisement provided

Yulee vs. Canova—Opinion of Court.

for in said act, the officer impressing the property shall, if he believe the appraisement to be fair and just, endorse upon it his approval; if not, he shall endorse upon it his reasons for refusing, and deliver the same, with a receipt for the property impressed, to the owner, his agent or attorney, and as soon as practicable, forward a copy of the receipt and appraisement and his endorsement thereon, to the board of appraisers appointed by the President and the Governor of the State, who shall revise the same and make a final valuation, so as to give just compensation for the property taken, which valuation shall be paid by the proper department, for use of which the property was taken, on the certificate of the appraisers as provided in the act of which this is amendatory."

The foregoing are all the provisions made by Congress applicable to this case and which were in force *at the time* of this transaction. It is true Congress on the 16th February, 1864, *subsequent* to the decision of the Board of Commissioners passed an amendatory act, remodeling the manner of ascertaining the compensation, giving the right of appeal to the owner of property, and taking away appeal by the impressing officer from decisions of the local appraisers, &c.— (See Statutes at Large of the 4th Session of the 1st Congress, page 192.)

Here in this act we see the scope of authority plainly and the path of duty well blazed out. In entering into the contract in question, did he pursue the authority given him in the act? It is obvious he did not. While the act authorizes him to purchase, and it is made his duty to purchase, yet "*in cases where the owner of such property and the impressing officer cannot agree upon the value thereof, it shall be the duty of such impressing officer,*" &c.

The evidence is full and distinct that these parties could not agree upon the value of the sugar; therefore his duty and authority was not to refer the ascertaining of the com-

pensation to any other tribunal.—Paine, 646 ; U. States vs. Ames, Woodbury & Minot, 89.

Again.   Did the appellee in entering into said contract act under authority of any legal order of the War Department ? By the extract from General Order, No. 92, given in the above statement of the case, it will be seen, he was authorized to purchase, and when necessary to impress, but when authorized to resort to impressment, was required to observe strictly the requirements of law, &c.

From the extract from General Order, No. 37, the impressing officer is instructed what to do before any impressment of property shall take place; if the price offered is refused, then it directs that compensation for the property will be made according to the act of Congress aforesaid, for the regulation of impressments.

Again.   That the property shall remain in the possession of the owner, his bailee or agent, and at his risk, during the pendency of the proceedings for the ascertainment of the compensation, unless, &c.

It is obvious there is no authority in these orders giving to the appellee the power to change the mode and manner of fixing the compensation.   We ask, wherein then, is this contract connected with a subject fairly within the scope of his authority ?  It is certainly not found in this record.  Again, it is not signed by the appellee *officially*.   It is true he recognizes it, but it was the act of his attornies ; he recognizes it as a private contract and stipulation.   We are forced to the conclusion that the appellee in entering into said contract did not act within the scope of his authority ; having done so, it is presumed he acted in his private capacity, and therefore became personally responsible.

We would not be understood here, with a knowledge disclosed by the record, of the pressing necessities of the government, and the difficulties and delays to the use of the government for the army attending all the obstacles of a le-

gal contest, as casting any censure or gross violation of authority on the part of the appellee in sanctioning this contract and stipulation. On the contrary, we think he acted judiciously under the circumstances, and with a discretion involving his personal responsibility highly commendable to him, and in a manner which recommends him to a *moral* claim for indemnity from the government. Particularly as will be seen hereafter, that under the rulings of this court, the government has sustained no damage in consequence thereof, the rule of compensation being the same in both cases.

Having declared the appellee personally responsible, the next question is, whether this bill is instituted against him in his individual capacity? We think it is. The fact that the defendant in the bill of complaint is described as Major & Commissary, &c., and that he as such officer acted so and so, is but a mere *descriptio personæ*, and may be treated as inducement or surplusage.

This brings us now to consider the question, whether the court below had jurisdiction over this contract, it being an agreement respecting the sale of goods and chattels of a merely personal nature, and a stipulation as to the manner in which the compensation should be ascertained.

It is a general rule that courts of equity will not entertain jurisdiction for a specific performance of agreements respecting goods, chattels, &c., and other things of a mere personal nature, yet this rule is a qualified one and subject to exceptions. In enumerating these exceptions, Mr. Story in his Commentaries on Equity Jurisprudence, Vol. 1, page 41, and paragraph 723, says: " Where the specific performance of a contract respecting chattels will be decreed upon the application of one party, Courts of Equity will maintain the like suit at the instance of the other party, although the relief sought by him is merely in the nature of a compensation in damages or value; for in all such cases, the court acts upon

the ground that the remedy, if it exists at all, ought to be mutual and reciproca , as well for the vendor, as for the purchaser."

Now let us try this case by this rule.   Suppose the appellant entering into the agreement and stipulation in this case, had refused to deliver the sugar, had refused to comply with his stipulation, and threw obstacles in the way of the appellee's getting the same: is there any doubt but that a Court of Equity would upon his application have decreed a specific performance ?   Would it have been any answer to such an application that " consent cannot give jurisdiction ? "   Can there be anything found limiting the jurisdiction of the Court of Chancery ?   We think not.   The common saying that the " consent of parties can never give or bestow jurisdiction upon a court, where it does not otherwise *exist*," applies to courts of limited jurisdiction, that is to say matters in which the court is prohibited from taking jurisdiction, either by the constitution or the laws, as for instance where it is declared the court shall not entertain jurisdiction where the amount in controversy does not exceed $50, &c., or where there is a clear, full and adequate remedy at common law.

If then this stipulation of the parties agreeing to sell this sugar, deliver it, and refer the compensation to the court, could be enforced by the appellee, then the same stipulation and agreement can be enforced by the other party.

But, says Mr. Story in the same book, paragraph 717, " The truth is, that upon the principles of natural justice, Courts of Equity might proceed much farther, and might insist upon decreeing a specific performance of all *bona fide* contracts, since that is a remedy to which courts of law are inadequate ;" and cites Halsey vs. Grant, 13 Ves., 76, 77 ; Alley vs. Deschamps, 13 Ves., 228, as supporting this view. he adds :  " There is no pretence for the complaints sometimes made by the common lawyers, that such relief in equity

would wholly subvert the remedies by actions on the case and actions of covenant; for it is against conscience that a party should have a right of election whether he would perform his covenant or only pay damages for the breach of it."

But we find the Supreme Court of the United States giving more extensive jurisdiction in equity to grant relief by a specific performance in contracts respecting personal chattels than is exercised in the English Courts. In the case of The Mechanics' Bank of Alexandria vs. Seton, 1 Peters, 305, that Court say: "It has been said that a Court of Chancery will not decree a specific performance of contracts, except for the purchase of lands or things that relate to the realty, and are of a permanent nature; and that where the contracts are for chattels, and compensation can be made in damages, the parties must be left to their remedy at law. But, notwithstanding this distinction between personal contracts for goods and contracts for lands, is to be found laid down in the books as a general rule, yet there are many cases to be found where specific performance of contracts, relating to personalty, have been enforced in Chancery; and Courts will only weigh with greater nicety contracts of this description, than such as relate to lands."

In our sister State of Georgia, the Court of Equity in that State say they would have decreed a specific performance of an express agreement to set off the debts against each, *pro tanto*, if the agreement had been established.—Ruckersville Bank and others vs. Hemphill and others, 7 Georgia, 397.

Thus it will be seen that the Court of Chancery in the Suwannee Circuit, before his Honor Judge Dawkins, had jurisdiction of this agreement and stipulation, without the consent of parties, or in other words, it was not the consent of parties alone that gave the Court jurisdiction in this cause.

We are, therefore, of the opinion the Court below had jurisdiction over this agreement and stipulation.

We are next to consider whether, under the bill and pleadings, the case is sufficiently stated upon which the agreement and stipulation can be forced.

On this point we are constrained to say the bill is inartistically drawn. But it is not demurred to or excepted to; we are, therefore, to take it as we find it. Upon referring to it we see that the contract and stipulation therein contained are sufficiently set forth; it is given *hæc verba*, and we find the prayer in conformity therewith, although it prays " that a decree may be made awarding full and just compensation," and it is as though it had prayed specific performance, for " full and just compensation" was the basis and sum of the agreement and stipulation.

But on the part of the appellee it is contended with great ability and earnestness, that the Court below erred in receiving the proceedings of the local appraisers and Board of Commissioners in evidence, because in point of fact the whole question as to compensation was *res adjudicata*. This brings us to inquire what constitutes *res judicata*? Mr. Bouvier in his law Dictionary says, that " in order to make a matter *res judicata* there must be a concurrence of the four conditions, viz: 1. Identity in the thing sued for. 2. Identity of the cause of action; if, for example, I have claimed a right of way over Blackacre and a final judgment has been rendered against me, and afterwards I purchase Blackacre, this first decision shall not be a bar to my recovery when I sue as owner of the land, and not for an easement over it, which I claimed as a right appurtenant to my land Whiteacre. 3. Identity of persons and of parties to the action. 4. Identity of the quality in the persons for or against whom the claim is made; for example, an action by Peter to recover a horse, and a final judgment against him is no bar to an action by Peter, administrator of Paul, to recover the

same horse." For the purpose of argument let us consider (which is not the fact,) that the proceedings under the appraisement were had by the Board of Commissioners before the parties entered into the agreement in question. The agreement being *subsequently* entered into, what would be the condition of the parties as individuals?—(for what may have been the effect of it upon the government and upon the appellee as its agent on a claim for indemnity is one thing, and the effect of it upon him in his individual responsibility another thing.) Are the 2d, 3d and 4th conditions or any of them in concurrence with the 1st? No, for as we have already decided the cause of action in this case is against the appellee individually, and not against the government. Again, there is not an identity of persons and of parties to the action. In the one the government was the party, in the other, the appellee. Again, there is not the identity of the quality, for in the one case the party was agent of the government; in the other he was not, therefore not conclusive upon the same point.—Wright vs. Decklyne, 1 Peters, C. C. R., 199.

But let us return to the facts as they are in the record. We there learn that all of the proceedings before the local appraisers and the Board of Commissioners were had *after* the first agreement and stipulation was entered into between the parties, and that the proceedings on appeal before the Board of Commissioners were *after* the second agreement; and as we have held, these proceedings were in strict conformity with the agreement and stipulation; and as we have also held, by the express terms of that stipulation, these proceedings were to be used as *evidence*, i. e. persuasive evidence, on the issue of compensation. They constitute the appellee's evidence offered by him and received and read as such.

The remaining question is, what compensation shall be

8

allowed? What is just compensation? When and where shall this compensation be fixed? And *first*, what is just compensation? The current of authorities which we adopt say, that "just compensation" means an equivalent, a recompense in value for the property taken, what the article would sell for in the market, quality and quantity considered, and not the price which the owner might demand, or which some person for especial reason might be willing to give.

*Secondly.* By what market or where shall this compensation be fixed? Having held the transaction in this case to be a purchase, it follows, it must be governed by the rules of similar contracts. We are of the opinion that, according to numerous decisions, the market price where the sugar was sold and delivered should be the governing rule in this case. The sugar was sold and delivered in Waldo, therefore the price at that market should have been ascertained.

*Thirdly.* When or upon what date shall the value or price be fixed? On this point it is contended by the counsel for the appellant that it should be ascertained as of the day of the adjudication, i. e., the day of the date of the decree of the Court below, which was the 11th day of May, A. D. 1864.

On the part of the appellee it is insisted it should be of the day the impressment was made, to-wit: the 25th July, A. D. 1863.

In all contracts for the sale of goods, the price to be fixed therefor, where no price is agreed upon, is the value thereof, quality and quantity considered, on the day of the sale and delivery, and as this is adjudged to be a case of purchase and sale, we think that should be the rule in this case.

A more difficult question is to ascertain from the record on what day the perfecting the sale by delivery of the sugar took place. The only testimony on that point is the two parts of the agreement and the letter of said Yulee. The first part of the agreement is dated the 11th day of Sept.,

A. D. 1863. If this were all, we could conclude, under that portion thereof wherein it is stated and agreed "that the sugar shall be forthwith transported, on the requisition this evening made upon the said Yulee, President of the Florida Railroad Company, by Capt. Call, and no further obstacles to its transportation interposed," that the delivery took place on that day. But we find that on the 23d September, A. D. 1863, the appellant writes to his counsel, " I am perfectly willing to its immediate delivery (the sugar,) if there is no change in the original understanding."

From these expressions we conclude the sugar had not then passed into the hands of the purchaser, and that there had been no delivery, the sale not as yet perfected.

On the 23d October, A. D. 1863, the supplemental agreement was entered into. In that the following words are used : " It is agreed that the Confederate States have appropriated to its use sixty-four hogsheads sugar belonging to the complainant," &c.

It appears evident that at the time last mentioned, to-wit : on the 23d October, A. D. 1863, the sugar had been delivered. It must either have been delivered on that day or on some day between then and the 23d September. According to the testimony of Mr. Dozier, one of the local appraisers, it was in the depot warehouse at Waldo on the 17th September, A. D. 1863. The Board of Commissioners made their valuation on the 20th October, A. D. 1863. We conclude, therefore, that somewhere on or about the 23d of October aforesaid, the appellee took possession of said sugar, and accordingly fix the period for ascertaining the value on or about the 23d day of October, 1863. The Chancellor therefore erred, (this being a purchase,) in fixing the compensation on the 25th July, the date of the impressment. Here we do not wish to be understood as holding that under *impressments* the compensation should be fixed as of the day of the impressment. That question, under the view which

we have taken of this agreement, does not arise, and has, therefore, not been considered.

Having thus laid down the rules under which the value is to be ascertained, we turn to the testimony to see what was the market price at Waldo aforesaid on or about the 23d of October, A. D. 1863.

Upon a thorough examination of the testimony introduced by the appellant, the nearest to the period fixed is that of Mr. Houston, Mr. Burnett and Mr. Allen.

The witness Houston says: That about six weeks ago, he, as the agent of Mrs. Hopkins, sold to Col. Summers sugar at $2.05 per pound in new currency, delivered at Archer. This witness testified on the 10th May, A. D. 1863. The price of the sugar should have been fixed as of on or about the 23d of October, A. D. 1863. Between those two dates there is a lapse of about five months. There is nothing in the record going to show that during these five months the price of sugar was the same, while on the contrary, it appears it was rising in value. The Court thinks this testimony too remote. The witness Burnett says, he gave $1.75 a week before, which would be a week before the 10th of May, and about six months thereafter the delivery of the sugar was made. This is also too remote.

The witness Allen testifies, that he was agent of the Commissary Department; that at the time he gave in his testimony, which was on the 10th May, 1864, he was instructed to give $2 per pound, delivered at the plantation. This was almost seven months after the delivery of the sugar in question; accordingly this testimony, without some evidence that the price was the same in the month of October preceding, is too remote. On the part of the appellee the only testimony is the amount fixed by the local appraisers, which was on the 17th September, A. D. 1863, and the valuation by the Board of Commissioners on the 20th October, A. D. 1863. Between the day of the finding of the local appraisers and

Yulee vs. Canova—Opinion of Court.

the delivery of the sugar, there was a lapse of about five weeks, and the averments in the suit of the city of Savannah, which have been made evidence by the stipulation, are that sugar was rapidly rising at that time, and the current of testimony is that at no time was it falling. By the agreement it was made *evidence*, and the Chancellor could not reject it. He was compelled, and so is this Court, to give it such weight and consideration as it is entitled to.

The valuation of the Board of Commissioners comes up to on or about the delivery of the sugar.

By the said agreement of the parties it was also made *evidence*, and it was the duty of the Court below so to consider it, and, as we have already stated, this was *persuasive* evidence before the Chancellor, entitled to such weight as he in the sound exercise of his judgment might give it. The Chancellor, as appears in the decree, gave full weight and credit to the appraisement made by the local appraisers, and were it not for the fact that the record discloses, as will be seen by reference to the testimony of Mr. Dozier, that they, the appraisers, fixed the value as of on the 25th July, A. D. 1863, the time of the impressment, instead of on the 17th of September, when they made it; and were it not for the fact, that the decree states that his Honor, the Judge in the Court below, was of the opinion that the compensation should be ascertained by the appraisement of the property on the said 25th of July, and so adjudicated, we would not send the case back for further testimony. The testimony being so uncertain, conflicting and remote, we think the ends of justice will be best subserved by sending the case back to the Court below for further testimony in this respect, and to decree under it as the proofs may warrant, according to the principles laid down in this opinion of the Court.

It is on consideration thereof, now here ordered and decreed by this Court, that the decree of the said Circuit Court in this cause be and the same is hereby reversed, and that this

cause be and is hereby remanded to the said Circuit Court, with instructions to take testimony and ascertain the amount of compensation to be allowed the appellant for said sugar, according to the principles and rules laid down in the foregoing opinion of this Court, and to render decree therefor, and further, to do such acts and things as may be necessary, and as good conscience may require.